Tammy Hussin (SBN: 155290)
HUSSIN LAW
1302 N. Coast Highway 101, Suite 201
Encinitas, CA 92024
Tel: (877) 677-5397
Fax: (877) 667-1547
Tammy@HussinLaw.com

Attorney for Plaintiff, Irma Warren

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**WESTERN DIVISION**

| | |
|---|---|
| Irma Warren,<br><br>                 Plaintiff,<br><br>  v.<br><br>Westlake Services LLC, a California Corporation;  and  DOES  1-10, inclusive,<br><br>              Defendants. | Case No.:<br><br>**COMPLAINT FOR DAMAGES:**<br>**1. VIOLATION OF TELEPHONE CONSUMER PROTECTION ACT, 47 U.S.C. §227 *et seq.*;**<br>**2. VIOLATION OF FLORIDA FAIR DEBT COLLECTION PRACTICES ACT, Fla. Stat. §§559.55 *et seq.*** |

For this Complaint, the Plaintiff, Irma Warren, by undersigned counsel, states as follows:

**JURISDICTION**

1.    Jurisdiction of this Court arises under 28 U.S.C. §1331, and pursuant to 28 U.S.C. §1367 for pendent state law claims.

1

2.     This action arises out of Defendants' violations of the Telephone Consumer Protection Act, 47 U.S.C. § 227, *et .seq*. (the "TCPA"); and the Florida Consumer Collection Practices Act, Fla. Stat. §§559.55, *et. seq..* (the "FCCPA").

3.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), in that Defendant's principal place of business is located here, regularly engages in business here, and a substantial portion of the acts giving rise to this action occurred here.

### PARTIES

4.     Plaintiff, Irma Warren (hereafter "Plaintiff"), is an adult individual residing in Tampa, Florida. Plaintiff is a "person" as defined by 47 U.S.C. §153(10) and is a "debtor" as defined by Fla. Stat. 559.551.

5.     Defendant, Westlake Services, LLC d/b/a Westlake Financial Services ("Westlake"), is a California entity, with its principal place of business located in Los Angeles, California. Westlake is a "person" as defined by 47 U.S.C.A. § 153(39) and Fla. Stat. § 559.551.

6.     Does 1-10 are other entities which, upon information and belief, may have engaged in collection activity on behalf of Westlake.  One or more of the Collectors may be joined as parties once their identities are disclosed through discovery.

7.     As detailed more fully below, Plaintiff owed a financial obligation (the "Debt") to Westlake. The Debt arose from services provided by Westlake which were primarily for family, personal or household purposes.

### WESTLAKE'S HISTORY OF UNLAWFUL AND UNFAIR CONDUCT

8.     Westlake specializes in purchasing and servicing subprime and near-subprime automobile loans. These loans are made to borrowers who generally have low credit scores, low income levels, and are generally among the least sophisticated consumers.

9.      Westlake is notorious for preying on these unsophisticated consumers, and for violating federal and state consumer protection laws while engaging in unfair and illegal debt collection tactics. Westlake's widespread illegal conduct caught the attention of the Consumer Financial Protection Bureau ("CFPB"), and Westlake was ordered to pay consumers $44 million dollars in relief for its widespread unlawful debt collection activities.

10.      As part of the Order, the CFPB mandated Westlake to cease its unlawful and illegal debt collection activities and overhaul its business practices.

11.      Despite being ordered by the federal government to clean up its act, Westlake continues to abuse customers, like Plaintiff, on a regular and systematic basis. In fact, the CFPB still receives hundreds of consumer complaints each year regarding Westlake's illegal collection tactics.

12.      In addition to those consumers who complain to the government, other consumers have lodged thousands of complaints regarding Westlake's abuse. Westlake customers continue to complain of Westlake's aggressive and abusive debt collection tactics, and of getting inundated by Westlake with unwelcome automated calls.

13.      As part of its unlawful and unfair debt collection tactics, Westlake bombards its customers with automated collection calls without their consent in violation of the Telephone Consumer Protection Act ("TCPA").

14.      Westlake is no stranger to the TCPA, and has been called to defend a multitude of TCPA actions, including TCPA class actions. In one such action, Westlake agreed to pay $10 million dollars to settle (*Duchene v Westlake Services*, Case 2:13-cv-01577-MRH (W.D. Penn.).

15.      Even after knowing the prohibitions of the TCPA and paying millions to settle TCPA claims, Westlake chooses to disregard the Act by continuing to place automated calls to consumers without their consent.

## **WESTLAKE AND THE PLAINTIFF**

16.     Plaintiff's recent experience with Westlake typifies the unlawful abuse described by thousands of other consumers.

17.     On or around December 31, 2015, Plaintiff's mother, Lillie Irons ("Lillie"), entered into a loan for the purchase of a vehicle. Plaintiff was a co-signor on Lillie's loan.

18.     Both Plaintiff and Lillie provided their cellular telephone numbers to the car dealership when they entered into the loan.

19.     After purchasing the vehicle, the dealership transferred, sold, or otherwise assigned the loan to Westlake for servicing.

20.     Much to Plaintiff's dismay, Lillie passed away on October 6, 2016. Plaintiff was devastated by her the death of her mother, and her passing continues to cause Plaintiff a tremendous amount of sadness and depression. After Lillie's passing, Plaintiff began using her dead mother's cellular telephone. Somehow it brought Plaintiff comfort to use her mom's phone, and Plaintiff used Lillie's phone to speak with family and friends.

21.     On or around October 24, 2016, Plaintiff called Westlake to advise that Lillie had passed away. Plaintiff made clear to Westlake that she intended to resolve the past due balance either by taking over the loan or by surrendering the vehicle to the dealership. Plaintiff requested that Westlake provide her with some time to figure out what to do with the vehicle.

22.     Despite knowing Plaintiff had every intention to pay the balance, Westlake nonetheless began calling Lillie's cellular phone in an attempt to collect the Debt at an excessive and harassing rate, sometimes calling four times a day.

23.     When Plaintiff answered, Westlake asked to speak to her dead mother, causing Plaintiff additional sadness and distress.

24.     Plaintiff told Westlake not to ask for her dead mother, especially since Westlake already knew she had passed away. Plaintiff told Westlake that it made her more upset when they called asking to speak to her dead mother, and directed Westlake to stop causing additional pain by asking for Lillie.

25.     Plaintiff also told Westlake that she was using Lillie's cell phone and that Lillie's cell number now belonged to her. Plaintiff directed Westlake to stop calling Lillie's cell number altogether, and directed Westlake to only call Plaintiff on her old cellular number.

26.     Westlake ignored Plaintiff's directives, and continued to call Plaintiff on her mother's old cell number, and during such calls Westlake continued to ask to speak to Lillie.

27.     Plaintiff continued to speak to Westlake and repeatedly told representatives to stop calling Plaintiff on her mother's old cell number.

28.      When Plaintiff told Westlake to only call on her old cell number, she was met with rude and abusive representatives. One Westlake representative told Plaintiff that Westlake would continue calling both phone lines until the Debt was paid.

29.     As promised, Westlake continued to barrage Plaintiff with calls, and representatives continued to ask to speak to Lillie when Plaintiff answered. When Plaintiff didn't answer Lillie's phone, Westlake left voicemails directed for Lillie rather than Plaintiff, and then called Plaintiff's old cell number.

30.     Plaintiff begged Westlake representatives to stop calling Lillie's phone and stop asking for Lillie, and advised Westlake that the continued calls were causing her great distress and adding to her sadness. Westlake representatives were callous and refused to comply with Plaintiff's repeated requests. Representatives vowed to keep continue calling both phones until such time as the Debt was paid, and at one point threatened to take Plaintiff to court.

31.     Westlake's harassing calls and verbal abuse continued to cause Plaintiff sadness and depression to escalate, and on or around November 28, 2016, Plaintiff directed Westlake to cease all calls to both cellular numbers.

32.     Again, Westlake ignored Plaintiff's do-not-call directive, and continued to call Plaintiff on both of her cellular numbers.

33.     In addition, after knowing how and where to reach Plaintiff, Westlake called Plaintiff's brother and asked to speak to his dead mother. Plaintiff's brother was extremely upset by Westlake's call, which caused Plaintiff more anxiety.

34.     Meanwhile, Plaintiff arranged to turn in the vehicle and asked Westlake for a payoff. Plaintiff turned in the vehicle and the dealership satisfied the Debt in full. Thereafter, Westlake apparently had made a mistake with the payoff quote, resulting in an amount due back to Plaintiff. Westlake then sent Plaintiff a check in her dead mother's name, adding on even more distress for Plaintiff.

35.     On or around January 15, 2017, Plaintiff called Westlake and spoke to a supervisor in order to lodge a complaint about Westlake's harassment and mistreatment. The supervisor was equally rude, and spoke to Plaintiff in an oppressive and demeaning manner.

36.     On or around January 16, 2017, Plaintiff received a call back from a different supervisor. The supervisor apologized for the harassment told Plaintiff that he was "sorry for her loss." It was the first time anyone at Westlake treated Plaintiff with respect and dignity.

37.     To this day, Plaintiff remains distressed over the inhumane, unfair, and abusive treatment she received from Westlake.

**COUNT I**

**VIOLATION OF THE FLORIDA CONSUMER COLLECTION PRACTICES ACT, FLA. STAT. §§559.55, *et. seq.***

38.     The Plaintiff incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

39.     The Florida Consumer Collection Practices Act, Fla. Stat. §§559.55 *et. seq.*, prohibits unfair and deceptive acts and practices in the collection of consumer debts.

40.     Westlake willfully communicated with Plaintiff with such frequency with the intent to harass Plaintiff, in violation of Fla. Stat. §559.72(7).

41.     Westlake willfully engaged in conduct which was reasonably expected to harass and abuse Plaintiff, in violation of Fla. Stat. §559.72(7).

42.     Westlake willfully abused Plaintiff by repeatedly contacting Plaintiff and asking to speak with her dead mother, in violation of Fla. Stat. §559.72(8).

43.     Plaintiff is entitled to damages of up to $1,000.00 per violation as a result of Westlake's violations of the FCCPA. *See, Beeders v Gulf Coast Collection Bureau*, 632 F. Supp. 2d 1125; 2009 U.S. Dist. LEXIS 55933 (USDC, M.D. FL, 2009).


**COUNT II**

**VIOLATIONS OF THE TELEPHONE CONSUMER PROTECTION ACT - 47 U.S.C. §227, *et. seq.***

44.     The Plaintiff incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

///

///

45.     Within the last four years, Westlake called Plaintiff on her cellular telephones without her consent by using an automatic telephone dialing system ("ATDS") and by using a prerecorded or artificial voice.

46.     When Plaintiff answered the calls, Westlake used an automated or prerecorded voice prior to connecting Plaintiff to a live representative.

47.     Defendants also left messages on Plaintiff's voicemail using an automated voice.

48.     Westlake's telephone dialing system has the capacity to store randomly or sequentially generated telephone numbers and randomly or sequentially dials telephone numbers.

49.     The telephone number called by Defendants was assigned to a cellular telephone service for which Plaintiff incurs charges for incoming calls pursuant to 47 U.S.C. §227(b)(1).

50.     The calls from Defendants to Plaintiff were not placed for "emergency purposes" as defined by 47 U.S.C. §227(b)(1)(A)(i).

51.     Although Plaintiff and Lillie originally provided their consent to be called by Westlake, Plaintiff effectively revoked her consent by telling Westlake many times to stop calling.

52.     As such, Westlake's automated calls were made without consent in violation of the TCPA pursuant to 47 U.S.C. §227(b)(1)(A)(iii).

53.     Westlake knows the prohibitions of the TCPA, and has been called to defend itself in a multitude of TCPA law suits nationwide, including TCPA class action litigation. Despite being intimately familiar with the TCPA, Westlake continued to barrage Plaintiff with automated calls over her repeated objections while knowing the calls were extremely upsetting for Plaintiff.

54.     As such, the automated calls Westlake made to Plaintiff were made in knowing and/or willful violation of the TCPA, and Westlake should be subject

to treble damages pursuant to 47 U.S.C. § 227(b)(3)(C). *See, e.g., King v Time Warner Cable,* 1:14-cv-02018-AKH (S.D.N.Y.); *J2 Global Communications v Blue Jay, Inc.,* 2009 WL 4572726 (N.D.Cal.); *Coniglio v Bank of America*, Case No. 8:14-cv-01628 EAK-MAP (USDC, M.D. FL., Docket No. 16, Oct. 11, 2014).

## **PRAYER FOR RELIEF**

WHEREFORE, the Plaintiff prays that judgment be entered against the Defendants:

A. As a result of each call made in negligent violation of the TCPA, Plaintiff is entitled to an award of $500.00 in statutory damages pursuant to 47 U.S.C. § 227(b)(3)(B).

B. As a result of each call made in knowing and/or willful violation of the TCPA, Plaintiff is entitled to treble damages in an amount up to $1,500.00 pursuant to 47 U.S.C. § 227(b)(3)(B) and 47 U.S.C. § 227(b)(3)(C);

C. Statutory damages of $1,000.00 for each violation, and punitive damages for knowingly and willfully committing the aforementioned violations pursuant to Florida Statutes § 559.77(2);

D. Reasonable attorney's fees and costs incurred by Plaintiff pursuant to Florida Statutes § 559.77(2); and

E. Such other and further relief as may be just and proper.

DATED: May 9, 2017       By: *\_/s/Tammy Hussin\_*
                                   Tammy Hussin, Esq.
                                   Hussin Law
                                   Attorney for Plaintiff, Irma Warren